Mr. Humphrey, we're happy to hear from you. Thank you, Your Honor. May it please the Court. This case arises out of a massive, undisputed accounting fraud which resulted in the bankruptcy of IBG. Our brief sets forth eight legal and factual issues compelling reversal of the Bankruptcy Court's order, which absolved Morgan Keegan & Keith Meyers of liability for the fraud on each of our four causes of action. I'd like to focus my arguments today on four issues which would resolve our breach of producer's rights of fiduciary duty and aiding and abetting breach of fiduciary duty claims, and rest in our briefing for the remainder. First, Meyers & Morgan Keegan do not dispute here that their impaired electoral defense does not apply to these claims as a matter of law. Second, the Bankruptcy Court erred as a matter of law in finding that Meyers & Morgan Keegan did not owe a fiduciary duty to IBG. Third, the Supreme Court has held that testimony which is in conflict with contemporaneous evidence can be given little weight, and the Bankruptcy Court clearly erred in wholesale adopting Meyers and his associate Calvin Clark's testimony without addressing the substantial and often contemporaneous evidence which directly contradicts it. And fourth, the Bankruptcy Court clearly erred in finding the trustee's damages evidence was unreliable and erred with respect to causation. Okay, counsel, if we uphold the Bankruptcy Court's factual findings, what is left of your case today? If the court were to uphold the factual findings, I believe that would end the case. We would need to prevail on both factual issues and legal issues. Is that also true if more narrowly, just to take a slightly narrower version of Judge Keenan's question, if we accept it as plausible the Bankruptcy Court's decision that Morgan Keenan and Meyers, to the fraud of the accounting practice, like just that one factual finding, would that leave you a claim? That would, Your Honor. What claim would that – I thought it would, but what claim would that leave you? So, for instance, that would leave us both our breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims. So breach of fiduciary duty involves not only disposing evidence which you know, but based on the nature of the relationship between IBG and Meyers and Morgan Keenan, it involves due diligence. Professor Freeman extensively explained the obligations that Meyers and Morgan Keenan assumed under both the 2006 and 2008 engagements to, quote, unquote, employer searching I, and not be satisfied with the club answers from management if they raised any questions. So if Meyers and Morgan Keenan did not appropriately conduct their due diligence, then that would constitute a breach of fiduciary duty even if they didn't know of the fraud and failed to disclose it. And it would be the same for aiding and abetting breach of fiduciary duty. It would be that they materially participated with the management defendant's breaches of their fiduciary duty. Wouldn't that second one require their knowledge of the breach, their knowledge of the fraud? I mean, I get your first argument, and I at least follow that argument. But the aiding and abetting piece also seems to depend upon Morgan Keenan's knowledge that the accounting practices were fraudulent. The standard for aiding and abetting requires actual or constructive knowledge that the conduct they're engaging in is improper. So if they had constructive knowledge that there was some issue with the accounting that maybe they didn't fully appreciate, but nevertheless, once again, turned a blind eye and willfully aided the management defendants in deploying this fraudulent accounting policy which caused IBGE to incur net operating losses, that would constitute aiding and abetting breach of fiduciary duty. Okay, so knowledge or constructive knowledge. But if we agree that's not there, that's the aiding and abetting. We'd only be left with the breach of fiduciary duty. That's correct. If the court were to find no constructive knowledge, and again, constructive knowledge can be, it's something that they should have known if they had looked for it, not necessarily actual personal knowledge that the policy was fraudulent, it would be constructive knowledge based on what they would have been able to determine had they appropriately fulfilled their obligations to the company instead of just willfully going along with management and helping them implement a fraudulent accounting policy. So can you turn to the first issue about whether impar delicto applies here? I understand your argument to be that if your action was brought under 541, that our binding case law requires it to be. But I deduce from your argument, although it's not perfectly clear, that you're arguing instead that this is a 544 action on behalf of a creditor, and therefore it doesn't apply. Is that the argument you're making? That's correct, Your Honor. So why, okay, I'm not trying to cut you off, but we don't have a lot of time given the number of questions. But why is this a creditor's claim as opposed to IBG's claim? At 544, it would have to be the creditor's own claim, and MK owed no fiduciary duty to a creditor, I presume. It would not necessarily be the creditor's own claim. Under 544A1, a trustee assumes the rights and powers of a hypothetical judgment lien creditor, and those rights and powers are governed by state law. In South Carolina, a judgment lien creditor can obtain a cause of action belonging to the debtor and bring it on the debtor's behalf. So, for example, if I have a judgment against John Doe for $100 and he has a breach of contract claim against a third party for $1,000 he's not bringing, I, as a creditor, can stand in John Doe's shoes and bring that claim for breach of contract and cover money. Totally fair. But then you're still standing in the debtor's shoes, right? And then you've still got the problem of our derivium capital, which says when you stand in the shoes of the debtor, you take the good and the bad. You take the imparted delecto defense. I mean, you can disagree with the case, but I can't disagree with it. So if you're standing in the shoes, whether by virtue of 541 to a state law cause of action or 541 directly, our case seems to say that the doctrine still applies. Well, under 544A, the trustee is standing in the shoes of a creditor who would be standing in the shoes of the debtor. But in late derivium capital, this court recognized the appeal of not applying impaired delecto to a trustee in those circumstances. And did it. Because it felt constrained by 541's plain language. 544A is substantively different and says that the trustee has the rights and powers of a hypothetical judgment lean creditor without regard to any knowledge of the trustee or of any creditor. And courts, including within this circuit, have interpreted that to mean. That's very true if the claim is the creditor's own. But you're asking us to then take that and run it through the lens of state law, which, just like 541, requires him to stand in the shoes of the debtor. And that's the same language or the same principle that required derivium capital to apply impaired delecto. In late derivium capital required the application of impaired delecto because it conditioned the trustee's status as stepping in the shoes of the debtor as of the commencement of the case. And this court held that as of the commencement of the case, the debtor would be subject to the defense of impaired delecto. Again, 544A contains that language, but it contains a further qualification that the trustee's powers are without regard to any knowledge of the trustee or of any creditor, which has been interpreted by courts to extend to knowledge of the debtor, which is not imputed back to a trustee proceeding under 544A. And courts have recognized that impaired delecto does not apply to claims being brought under 544A. We cited the Inouye Porter-McLeod case out of Colorado, which contained an extended discussion about how when you stand in the shoes of a creditor under 544A, that is substantively different from standing in the shoes of a debtor under 541. But that's a case where you're standing in the shoes of the creditor as the creditor's own claim, not standing in the shoes of a creditor who is then standing in the shoes of the debtor. Well, Inouye Porter-McLeod involved claims on behalf of the debtor for legal malpractice and for aiding and abetting breach of fiduciary duty. They weren't the creditor's personal claims against the third party, against that law firm. So it has been interpreted to apply to claims which belong to the debtor, which would be brought by a hypothetical judgment-laying creditor under 544A. Can I take a step all the way back? So all of this presupposes the existence of fiduciary duty, right? All of the trustees' claims against Morgan Keegan presuppose the existence of – well, many if not most of them. Am I right about that? Well, we have one claim directly for breach of fiduciary duty. For aiding and abetting breach of fiduciary duty, the operative duty is between the management defendants and IBG. And we have our common law fraud and Rule 10b-5 claim, which don't directly involve fiduciary duty. So given that the 2006 contract says that they were allowed to rely on financial information provided, how could that relationship possibly have yielded a fiduciary duty? For two reasons. As far as Myers testified at trial, that language meant that Morgan Keegan would not hire an outside auditor to review IBG's finances and render an independent opinion. And it was undisputed at trial from testimony provided by our expert, John Freeman, and also by Morgan Keegan's expert, that a party cannot contract around its obligations under the securities laws. You can put that in a contract, but that doesn't mean it's going to have any legal effect. The contract also said that Morgan Keegan was going to be responsible for its own actions and ensure compliance with the law. And we know from testimony provided by Keith Myers and Calvin Clark, that they did, in fact, provide due diligence, and they did question some of the data that was provided by IBG. But taking a further step back, the test under South Carolina law for whether fiduciary duty exists is whether someone had imposed a special confidence in another such that he has some foundation to believe that the party entrusted is going to act in that party's best interest. And the bankruptcy court never applied that standard to begin with, which in and of itself constitutes an error of law. And under this court's opinion, in Evaluate Citizens Association, the failure to apply the proper standard renders any findings regarding fiduciary duty clearly erroneous, at least on the brief side of it. And, of course, fiduciary duty itself is a question of law, which this court reviews de novo. Turning to our third issue, we provided this court with 42 pages of briefing, detailing the substantial evidence which the bankruptcy court disregarded. And critically, the court never accounted for Myers and Clark's own contemporaneous writings from 10, 12 years prior, which say the exact opposite of what they testified to at trial. Morgan Keegan and Keith Myers, for their part, never attempt to reconcile that testimony. And critically, in their brief, they never argue that the bankruptcy court actually considered the specific evidence presided. And that renders the court— Am I fair to say here that your argument is that this is implausible, the bankruptcy judge's finding is implausible, because the only conclusion you could reach is that Myers lied. We have to conclude that when Myers testified, he lied about when he learned of the fraud. There are two parts to that question, Judge Richman. The first question is, were the findings clearly erroneous? That does not require finding that Myers lied. Well, because Myers said, I didn't know until the TS report came out. Correct. Myers said that, but the court disregarded his own admissions that he did, in fact, know. I understand, but he said it, right? And so whether that statement—if that statement is true, you lose this point, right? So we have to conclude he lied there, and you're pointing us to evidence that you allege impeaches him. That's correct. The finding is clearly erroneous, not necessarily because Myers lied, but because the court did not account for the contrary evidence. The next step is— Wait, how do I know that? That the bankruptcy court did not account for the evidence? Because it disagreed with you? I mean, just given the fact alone that it disagreed with you doesn't mean that it legally ignored the existence of the evidence, does it? Well, I would agree with that, but the clearly erroneous standard requires that the court engage in a principled fact-finding process, and it focuses on the process itself, not on the ultimate result. And a principled fact-finding process requires, among other things, a consideration and accounting for contrary evidence. And the bankruptcy court's order never discusses, for instance, the evidence of Myers' own admissions demonstrating his knowledge. The court never accounted for the evidence demonstrating that the disclosures in IBG's financial statements were, in fact, false. The court never accounted for the evidence demonstrating that Myers— What is your best authority for the proposition that an appellate court can reverse a trial court on the grounds that, although its findings perhaps could have been supported by the evidence, the trial court didn't do a good enough job of explaining why it decided to credit one thing over— I mean, I understand we require trial courts sometimes to make factual findings, written factual findings, but what's your best authority for the proposition that we impose on trial courts obligations about how they explain which factual findings they choose to make and which evidence they choose to credit? Judge Heightens, I'll direct you first to this court's decision in United States v. Wooden from a couple of years ago. And in Wooden, it was a commitment under the Adam Walsh Act of a sex offender. And at trial, it was a more traditional battle of the experts. The government's experts said that the gentleman still suffered from pedophilia and would have issues reoffending. And the defendant's experts said he didn't suffer from pedophilia and wouldn't have those issues. And the trial court accepted the defendant's expert, but this court unanimously reversed and said the problem with the trial court's order in adopting the testimony of the defendant's expert is it did not adequately explain the potential deficiencies in that opinion and why it found that opinion credible over the government's expert. But it didn't—what it didn't do, which I think is Judge Heightens' question, it didn't vacate in remand to say you might be able to justify, but you just didn't do a good enough job. We agree with your conclusion, but you just didn't do a good enough job in explaining it, right? I respectfully disagree. That is what the court did in Wooden. And the court in Wooden said, although the district court might not have been required to accept that the evidence recounted above proved Wooden's ongoing pedophilia, the court was required to at least consider the evidence and account for it when concluding otherwise. Right, but that's a completely different context. Talking about—here we're talking about a standard of review that the factual findings have to be clearly erroneous. Don't they for us to reverse the bankruptcy court? Well, the factual findings, yes, they do have to be clearly erroneous, and that was the standard. Exactly, and I think what the court was doing in that other case was saying, here you're making a determination whether somebody is a danger to the community in terms of release, someone who has been held under a civil commitment procedure for pedophilia. I mean, that's totally different from a bankruptcy court context where we have a standard of review that's well established for factual findings, isn't it? I see that, but I've gone over my time, so I'm going to respond to Judge Kuhn's question. Judge Kuhn, you are correct in that that was the legal context of the claim in Wooden, but the standard of review which Wooden applied was the clearly erroneous standard, and Wooden recognized that the standard is deferential, but it's not toothless, and ultimately reversed the bankruptcy court's—or the trial court's order on the basis that the findings were clearly erroneous because the court did not account for the evidence contradicting the expert's opinion. Thank you, counsel. Thank you. May it please the court. As Judge Keenan pointed out at the beginning of my friend's argument, the request here by the trustee really is to overturn the bankruptcy court's findings of fact. As the court knows, this appeal follows an 18-day trial before the bankruptcy judge. More than 200 pages of well-reasoned opinions from both the bankruptcy judge and then the district court, which affirmed the bankruptcy judge. The trustee's appeal to this court is overwhelmingly, if not exclusively, and I think it might be exclusively, a challenge to the findings of fact. Even the legal arguments, this talk of exceptions, perhaps, to inherent delicto, or factors that may or may not affect the scope or existence of a fiduciary duty, all of those arguments are made on the premise that the bankruptcy judge's findings must be rejected. There's no basis to do that here. As the court has mentioned, it's a clearly erroneous standard of review. And under that standard, as the Supreme Court put it in Anderson v. Bessemer City, quote, when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error, end quote. But your colleague says that it is contradicted, right? He says, oh, there's all this contemporary evidence that contradicts his statement that he didn't know this was a fraud. He does, Judge Richardson. I disagree both that that is the case and also that the bankruptcy court could ever be expected to account for every bit of evidence in those 18 days, if what that means, as my friend seems to be describing, is essentially recounting every bit of testimony, every exhibit, and explaining why you gave weight to one and not the other. That's not required of the court here. That said, if I may touch on a few examples coming from the trustee's briefs about things that the bankruptcy judge is said to have perhaps overlooked, but in reality did not. There's a claim in the trustee's reply brief at page 10. This is one of the bolder claims that comes up a lot. Quoting here, under the MK Defendant's watch, IBG's accounts receivables morphed into an estimate of fees IBG expected to earn, end of quote. So we've already got under watch, which is presuming a fiduciary duty that does not exist. Then what does the trustee cite there at page 10 of his reply brief? He cites a single page of the record, Joint Appendix, page 1408. Now that page was included in the confidential information memorandum available to those private equity firms who might want to invest in the debtor. The page includes one line from the financial information provided by IBG, provided by the debtor, for inclusion in this memorandum, and then a note explaining those numbers, which was also approved by IBG as an accurate description of what it had provided. Mr. Myers testified about this at Joint Appendix pages 919 and 920. Mr. Clark at Morgan Keegan also explained, and this is at page 868 of the Joint Appendix, that the financial information was provided by IBG, and Judge Heiden pointed out that's what the agreement between the parties required. IBG would provide the information. Morgan Keegan would then present it to potential investors. Mr. Clark testified that information was, quote, dropped in to the confidential information memorandum. So a statement in the brief about a policy changing under the watch of Morgan Keegan cites a single page, which is company information approved by the company as contemplated by the company's agreement with Morgan Keegan. Another example has to do with the PPM, or the Private Placement Memorandum. This is the document that IBG, the debtor itself, and on its own, used to solicit individual, as opposed to institutional, investments. The trustee's brief ignores the substantial evidence showing that Morgan Keegan was not involved in preparing that private placement memorandum, and actually says, quoting now from page 11 of the trustee's reply brief, the trustee refers to, quote, the PPM which NK defendants helped draft, end quote. In support of that, he cites to page 2703 of the joint appendix, that's just a page of the PPM itself. It's not any evidence of Morgan Keegan doing any drafting. In his brief in support of that point, the trustee also cross-references his prior briefs, and in particular, an email from Mr. Clark at Morgan Keegan. That email, which appears at page 1546 of the joint appendix, actually says that the, quote, financial section of the document, which is, as far as Morgan Keegan knows, a rescission document, more about that in a minute, will have to be completed, quote, with information that IBG is preparing. So this idea that Morgan Keegan is drafting a private placement memorandum not only ignores the evidence I just read, but also requires several steps of illogical backtracking. The PPM, as I mentioned, went to individual or potential individual investors. It was apparently created by IBG and its Securities Council, and it was represented by DLA Piper throughout the period here for securities advice. The Securities Council and IBG put out the PPM apparently by using a prior document, the rescission document. Now, Morgan Keegan had had what might be called some involvement in the rescission document in that IBG and its lawyers at DLA came to Morgan Keegan and said, hey, you've been working on that informational document for institutional investors. We gave you all our finances. Now our lawyers need it for a rescission document because of our prior violation of securities laws. Could you please send that stuff we gave you over to the lawyers so they can use it too? Morgan Keegan did that. So the sequence of events was company financial information sent to Morgan Keegan to be used in the confidential information memorandum for institutional investors. Then IBG says, hey, please send it to our lawyers. We've got to do a rescission offering. Morgan Keegan did that. And then apparently, and Morgan Keegan's witnesses testified they had no knowledge this was happening, but apparently that rescission document then morphed into this private placement memorandum. Those are the leaps that the trustee's argument requires when it makes assertions like the PPM drafted by Morgan Keegan. If I could return just a moment to the standard of review. In addition, of course, to the fact that that clearly erroneous standard applies to pure findings of fact, it also applies to mixed questions of fact and law. The trustee has asserted in a few places that, hey, some of these are actually legal issues. For example, the existence of fiduciary duty. They make that claim in their brief. Well, we know, though, from the Supreme Court's decision in U.S. Bank v. Village at Lake Ridge, that's 138 Supreme Court 960, and we actually knew before that from several decisions of this court, that when resolution of a mixed question of law and fact entails primarily factual rather than legal work, the clear error standard flies. And every apparently legal issue raised here, as the court has already appreciated, is enmeshed with and dependent upon the bankruptcy judge's findings of fact.  I'm taking you off your strain here, but Mr. Myers, I'll just call it MK, whoever it was, Mr. Myers, I believe, it appears from the record had some inclinations that this accounting policy was aggressive or there were red flags or there was a jump that was made. And assume for a minute, you can say it hypothetical or not, that I thought MK had some red flags that existed. Tell me what I do with that. And you assume that those red flags aren't actual knowledge. Your colleague says, well, that's constructive knowledge, right? That he knew that there were these red flags about the accounting policy and then didn't fix them. Help me understand what I do with that. So a couple of responses to that. The first one is, I assume you would arrive at that after applying the clear error standard to his own testimony, as the court asked earlier, do I have to think he lied? So maybe we won't use the word lied, but I do need to say that. He doesn't say that, right? Because it wouldn't be inconsistent with his testimony. Because his testimony was I didn't know until that happened. But but he did. He didn't say, listen, I thought everything about the accounting policy seemed like perfect. Right. I thought that this was like the squarest corners, every I dotted T cross. But he didn't say that. Right. And so that's my point. Right. Not that he knew. Right. The question is, were there enough red flags that, you know, even, you know, a non auditor would have said like something's fishy? OK, so two part response to that one having to do with the existence and scope of any obligation to do anything, even if that were the circumstance. And secondly, did he maybe do it? So let me talk a little bit about the underlying facts here. Mr. Myers absolutely did raise questions, as you've noted, recommended that they shift to a more conservative accounting practice. Right. He did because he said, look, any institutional investor is going to come in here and scrutinize things and maybe bring in an accounting firm. And again, it's important to remember that Morgan Keegan's focus is on bringing in institutional investment. They know they're going to do a ton of diligence and they were very open with the debtor about this. They're probably going to bring in an accounting firm. I mean, so against that backdrop, this idea that there was some collusion or secrecy really doesn't make sense. He did say they're going to want to know about this. They're going to want to know, A, why did this number move so high? Why did this receivable number move so high from one year to the next? And he was given an explanation that that had to do with the changing accounting of two subsidiaries or predecessors, one of which dealt, he told him, with manual check collection, the other with electronic. Mr. Sturgill explained to Mr. Myers when he said, why is this number jumping? Oh, we moved in the other sub, which had been doing gangbusters. That made the number higher. So that's one thing he asked about. He did also ask, as Judge Richardson notes and also Judge Keegan, about the, quote, aggressive accounting policy, this receivables treatment. He was told repeatedly by IBG that IBG's outside auditors had signed off on that as being GAAP compliant. Now, the auditors, and returning to the point of documentary evidence and the extent to which it's consistent with the testimony at Barapolese, there are indeed clean audit opinions from the debtor's actual outside auditing firm for every year in question here. So Mr. Myers says, hmm, I don't know about this receivables, what's going on here? And he's told repeatedly, our auditors have signed off on it. And he says, OK, because potential institutional investors, these players know how to bring in their own folks and check these numbers. And then he was told by IBG, Mr. Myers testified to this, we see your point, and even though we're GAAP compliant and our auditors have said so, we're going to move to something more conservative, to look better to potential funding sources, to give them a warmer feeling about building projections off of what we've shown them. So in response, circling back then to Judge Richardson's question, which I'm afraid I took quite a circuitous path to, but in terms of what do you do with it, well, he did raise questions and was told, we're going to change it, to the point where even by the time of the second Morgan Keegan engagement for the mezzanine financing, which is in 2008, fairly far down the road here, he sent some documents from the company and he says, what is this? I thought you were going to write off these financials. Why is this number still here? That is evidence in the record. So he told the company about it. He was told, it's GAAP compliant, and even so, we're going to make it more conservative so we can try to get investors interested. I want also to address, while we're on this general subject, this notion of, well, he didn't go to the other directors, the sort of, I guess, not bad directors. Important to remember in that connection, not only that there's no legal duty to do that, I mean, Morgan Keegan has a contract with the debtor under which he's going to report to management, and he did that and was utterly transparent with them at all times. Also insisted, as I mentioned a moment ago, that the debtor be utterly transparent with potential investors, notwithstanding that the confidential information memorandum designed for institutional investors had, like the 2006 agreement with the debtor, specific provisions saying, hey, these are the debtor's numbers. We, Morgan Keegan, are not wanting them, and you, potential investor, are agreeing that you're going to do your own diligence. Even so, Mr. Myers repeatedly told the debtor, you might want to think about doing this differently, was told that they would, and as for the directorship, the management personnel who were defendants in this case originally were four of the six board members during the relevant time period. There's some disputes in the evidence about whether the other six were doing much of anything at all, but this isn't a situation where there's sort of one rogue officer and, gosh, did you ever go to the whole board. Again, no apparent duty to do that, but it's also factually inaccurate. Everyone at the company knew about this. There's further proof of that to be found in the minutes of a board meeting held on January 8, 2007. At that meeting, as the court is aware from the briefs, there had been a 2006 agreement between the debtor and Morgan Keegan looking for institutional investment, and then later on there was a 2008 agreement. In the middle, right after the 2006 agreement terminated, there was a board meeting of IBG's board. No one from Morgan Keegan was there, but because Mr. Myers had suggested, you might want to think about some more conservative accounting, at that meeting the board discussed, A, changing the way we account for our receivables, and B, maybe changing our audit firm, because Mr. Myers had also suggested they go with a bigger name audit firm if they wanted to attract significant investment from private equity firms. The board met in January of 2007, discussed those issues, and decided they weren't going to change anything. On the contrary, we're going to just keep doing it the way we've been doing it. The minutes of that meeting, which again is in January 2007, can be found at joint appendix page 2848. Circling back on the question as it was asked, the contracts between the parties don't impose a duty to ferret out problems or even to report what might look like problems, nor is there the basis for a more extended fiduciary obligation, both because of the written agreements cabining the obligation, and also because, and this is a distinction between this case and the several cases the trustee cites about sort of financial advice and fiduciary duties. Morgan Keegan was not advising IBG about what to do with its money. It was not saying, hey, you might want to put some money in this, this would be good for your portfolio, you should invest in this business. All the cases they cite are situations like that. But if Morgan Keegan, I mean this is a little bit of a hard issue for me, but take on the 2008 agreement. If Morgan Keegan had acted contrary to IBG's interest with respect to the mezzanine debt, so they provided information that was against IBG's interest to potential investors for one reason or another, wouldn't we say that was a breach of their fiduciary duty? On the narrow question of with respect to the mezzanine debt, if they acted contrary to IBG's interest, wouldn't that be a breach of fiduciary duty? It could be, I agree. I mean, that could be. That's not in this case, of course. Oh, it's a hypothetical, that's why I'm asking. Right, so if Morgan Keegan says in 2008, we're going to take the financials you give us and give those to investors. And so there's kind of a flavor of agency there. Suppose the company provides its financials and Morgan Keegan changes the number, doesn't tell the company, just changes the numbers. And I pause at the phrase contrary to IBG's interest, because I think there may be a lot of different scenarios that could play there. But let's say that what Morgan Keegan did was, okay, you gave us our financials and we doctored them and then gave it to investors. Could it then be said you as our agent had a duty, perhaps even a fiduciary one, to pass along the numbers we gave you and not something you made up? Certainly, on those facts that could happen. Cabined again to the specific duties undertaken in the parties' written agreements, which is why it's important to remember here that the allegation that's being made about the existence of a fiduciary duty, it's not just they had one. It's they had one to figure out whether anything, not only whether the accounting was aggressive or whether investors would like it, but whether or not it's GAAP compliant. And then, the argument goes, there was a duty to do something beyond just telling the four-sixths of the board who are getting your regular reports and hearing as you question these things. So it's the scope of the duty claimed here that there's some kind of far-reaching agreement that would involve essentially performing an audit and informing, not only performing an audit, but bringing the results of that audit not only to management, but then to some of the other two directors who aren't in management, all while you're being told by the folks you do report to, yeah, we're going to change it. So to return to your question, yes, I think there are things that Morgan Keegan was obliged to do under their agreements. Had they not done them or not fulfilled an agency role under those agreements, maybe ideas of fiduciary duty could come into play. But those are not the facts here. And it really is. I see that I'm running out of time, which is too bad. So I would return, though, to the legal issues, really all depending on the facts. They also have other problems, as discussed in our briefs. I mean, we don't think the exclusions to imperio delicto. Oh, we absolutely do believe that imperio delicto applies to claims for fiduciary duty. In South Carolina, you'll see the Myatt case actually dismissed claims for breach of fiduciary duty based on imperio delicto. So it absolutely does apply. And for all those reasons and those in our briefs, we respectfully submit that this court should affirm the order of the district court. Thank you, counsel. Mr. Humphrey, we'll hear from you. Thank you, Your Honor. I'm going to begin where my friend began by addressing the notion that all of our arguments are somehow factual in nature, and that simply is not true. It is clear under South Carolina law and under this court's precedent that the existence of a fiduciary duty is a question of law for the court to decide. The standard for collusion under imperio delicto, that is a legal question for the court to decide. The standard for adverse interests under imperio delicto, that is a legal question for the court to decide. And this court's precedent is also clear that a trial court's failure to apply the proper legal standard for making a factual determination in and of itself renders the factual findings clearly erroneous, and this court need not engage in analyzing the other factors under that standard. Now, my friend's argument demonstrates that there's still oblivious to what the true standard of review is. Our argument is that the trial court erred by not considering the substantial evidence which disproved Myers and Clark's testimony. And my friend's argument merely said what they say in their brief, which is that there's some other evidence out there which could support the court's findings. But that's not the test. That's not the question this court has to ask. And at no point does Morgan Keegan or Keith Myers claim that the bankruptcy court actually considered the evidence that we say the court didn't. And I want to highlight a few of the points that my friend raised to demonstrate why this is important and why this matters in the context of this case. For example, she… I'm sorry. Can I ask you to do something slightly different for me? What are the… Give me the… With respect to MK's knowledge that the accounting practice was fraudulent, what are the three pieces of contradictory evidence that you would tell me to look at? Of course. Keith Myers admitted that his experience with accounting as being a licensed CPA and working at Deloitte makes him a better investment banker, and that knowledge enables him to spot errors in financial statements that even top-notch audit firms would miss. Morgan… That's impeachment, right? That's not something that is contrary to his statement that he had knowledge. The fact that he was a CPA and smart doesn't mean that he had knowledge. I'm asking, what is the evidence that's contrary to his claim I didn't know? Morgan Keegan's own expert admitted that Myers would have understood fundamental gap accounting rules at the time of the engagement, even back in 2006. And Myers explained that his understanding of the policy is that it violated those fundamental rules. So it was undisputed at trial that revenue cannot be recognized until it is earned, which in this case means that the check itself was actually collected. And Myers admitted at page 916 of the JA that he understood that Morgan Keegan was recognizing revenue before the check was collected, before that revenue was earned, which means that the policy violated gap. And my friend relied on the reassurances from Brian Sturgill, for example, as to why the policy was proper. The court never considered the evidence demonstrating that Myers firmly understood that Sturgill's explanation was incorrect. He attributed the $9.8 million jump in 2005 and the approximately $3 million jump in 2004 to an increase in IBG's hard collections business and this error in merging the hard collections business with the rest of the company. But Myers knew in his e-mails at page 1230 to 1232 of the JA that hard collections did not begin until June of 2005. So hard collections could not have been responsible for the $3 million increase in 2004, and the revenues from hard collections in 2005 were about $146,000 and therefore could not have accounted for anywhere near the $9.8 million jump in accounts receivable that IBG recorded for that year. With respect to the private place memorandum, my friend claimed that there's no evidence that Morgan Keegan and Keith Myers were involved in drafting it. At pages 18 through 20 of our brief, we discussed dozens of exhibits showing that Myers and Morgan Keegan were intimately involved in drafting this document. Do any of those show that they put in the financial information? Yes, they do. As a matter of fact, the last exhibit we cite even says that Haynes Hargreaves, IBG's CFO, will talk to Calvin Clark about including the financial information in the private place memorandum. That's IBG's CFO, I think. Isn't he the CFO? Yes, you can answer. That's the CFO saying, I will talk to MK about including them. That doesn't say that MK was the one including him as opposed to him. Well, the prior drafts of the document show the financials being inserted in and the claim that Morgan Keegan merely dropped what was in the CIM into the PPM is just proven by Myers' own email where he tells Calvin Clark that the CIM is way out of date, he put way in all caps, and cannot be used in its current form. And you also have Myers, we have his red line edits in the record. He's editing not just the financial section, which is prepared by Calvin Clark. He's substantively editing the risk disclosures, which were initially prepared by IBG's outside counsel. And he's describing how the new money is going to be used. He's identifying capital projects that are going to be funded by the new money. So this assertion that Myers firmly believed this was just a rescission document, again, is disproven by his own edits to it, including the fact that the PPM on its face says it's for raising $6 million in new money for the sale of new stock. And our argument is that the bankruptcy court never accounted for all that evidence. And that's the error. That's a fairly erroneous factual finding on the standard from the Anderson v. City and Bessemer City, from the U.S. Simpson case, from this court's decision in Buss v. United States, United States v. Wooden, time and time again, a court's reverse for not adequately accounting for evidence contradicting the testimony in which they rely. Thank you, counsel. We would, in normal times, come down and greet you and thank you so much for your help in our resolving this case. But we do not do that quite yet. We hope to return to it soon. But we hope to see you, whether back in Richmond or elsewhere, soon. Thank you very much. Thank you. Thank you, Your Honor.
judges: Julius N. Richardson, Toby J. Heytens, Barbara Milano Keenan